IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

GARDNER MCKAY WEAVER,          *
AIS #228713,                   *
                               *
     Plaintiff,                *
                               *
vs.                            *  CIVIL ACTION NO. 11-00385-WS-B
                               *
DEBRA TONEY, *et al.*,         *
                               *
     Defendants.               *

## REPORT AND RECOMMENDATION

Plaintiff, an Alabama prison inmate proceeding pro se and in forma pauperis, filed a Complaint seeking relief under 42 U.S.C. § 1983. This action was referred to the undersigned for appropriate action pursuant to 28 U.S.C. § 636(b)(1)B) and Local Rule 72.2(c)(4), and is now before the undersigned on Defendants' Motion for Summary Judgment and supporting materials (Docs. 13, 14, 18, 19, 29), and Plaintiff's Motion for Summary Judgment and supporting materials. (Docs. 32, 33). Upon consideration of the parties' motions, briefs and supporting materials, the undersigned finds that Defendants' motion is due to be granted, that Plaintiff's motion is due to be denied, and that this action should be dismissed with prejudice for the reasons set forth below.

I.   __BACKGROUND__

From its review of the record, the Court summarizes the parties' allegations which are material to the issues addressed in this Report and Recommendation. According to Weaver, in August of 2010, he arrived at the Atmore Work Release Center (hereinafter "AWRC") and was assigned to the maintenance department although he had no "hands on experience". (Doc. 33 at 3). Weaver asserts that he was often assigned to work on various cooking appliances in the kitchen, and that during a walk through inspection in December of 2010, he showed Officer C. Johnson problems with the stoves and ovens, and that Officer C. Johnson made notations regarding the problems. Weaver further asserts that during a walk through inspection in January 2011, he advised Officer Martin of problems with the cooking appliances and that Officer Martin also made notations about the problems. (Id.).

According to Weaver, on March 12, 2011, the kitchen steward directed him to ignite the pilot light on the oven, and when he attempted to do so, it blew up in his face. Weaver asserts that the explosion resulted in facial hairs being burnt off his face, caused his eardrum to ring for an hour, and resulted in permanent damage to his right eye. (Id.).

The record reflects and Weaver confirms that immediately following the incident with the stove, he was taken to the

Health Care Unit. (Doc. 4 at 4). The treatment notes reflect that Weaver's face was reddened, that his eyebrows and eye lashes were "singed", and that he complained about a burning sensation to his face. Weaver was treated with various creams for his burns and eye drops. (Doc. 14-2 at 12). On March 15, 2011, Weaver reported that the eye drops were burning his eyes, and that his eye balls felt "gritty". (Id. at 3). Nurse practitioner R. Barry Gaston, who is employed by Corizon, examined Weaver on March 16, 2011. Nurse practitioner Gaston did not find anything abnormal; however, he provided Weaver with a prescription for Naphcon, which is similar to Visine, because of Waver's complaints about sore eyes. (Doc. 14-1 at 2).

On April 13, 2011, Weaver was seen again by nurse practitioner Gaston due to complaints of blurred vision. (Doc. 14-1 at 2, 3). Once again, an eye examination was performed and no abnormalities were found. Notwithstanding nurse practitioner Gaston recommended that Weaver be seen by an optometrist because of his continued complaints of vision problems. Weaver was seen again on May 11, 2011 by nurse practitioner Gaston, who noted that a visit with an optometrist was being scheduled. (Id. at 3). The records reflect that on August 10, 2011, Weaver was examined by an optometrist. The eye examination revealed that Weaver's right eye, without glasses was 20/50, and his left eye, without glasses, was 20/40. Weaver was prescribed eye glasses

3

which he received on August 26, 2011. (Doc. 14-2 at 13, 14). As a result of Weaver's continuing complaints, he was examined by an ophthalmologist on October 26, 2011. Aside from prescribing artificial tears for Weaver's dry eyes, no additional treatment was recommended by the ophthalmologist. (Docs. 14-1 at 3; 14-2 at 15).

II.   **PROCEDURAL HISTORY**

Weaver filed his initial § 1983 Complaint on July 15, 2011, and named Debra Toney, and Correctional Medical Services (hereinafter "CMS") as Defendants. (Doc. 1). At the direction of the Court, Weaver, on August 11, 2011, filed an Amended Complaint on the Court's required form. (Doc. 4). Weaver contends that Defendant Debra Toney, warden of AWRC, violated his Eighth Amendment rights because he was assigned to a maintenance job although he had no experience, and Defendant Toney was on notice that the cooking appliances were not working properly. Weaver also contends that CMS deprived him of medical care because he was forced to wait approximately five months before being seen by an optometrist. According to Weaver, he suffered permanent eye damage in that the vision in his right eye went from 20/20 to 20/50[1]. Weaver requests a declaratory

---

[1]   Weaver also asserts that Kim Thomas, the Commissioner of Alabama'a prisons, failed to properly train the warden; however, Weaver's motion to add Thomas as a defendant was denied because (Continued)

4

judgment, injunctive relief, and money damages in the amount of $500,000. (Doc. 4 at 7).

Defendant CMS filed its Answer and Special Report on November 18, 2011 (Docs. 13, 14) and Defendant Toney filed her Answer and Special Report on December 8, 2011 (Docs. 18, 19). Defendant CMS denies the material allegations in Weaver's Complaint and contends that the record is devoid of any evidence showing that it acted with deliberate indifference for Weaver's medical care. CMS further contends that Weaver has failed to state a claim for medical malpractice under the Alabama Medical Liability Act "AMLA"), ALA. CODE § 6-5-541 et seq. (1975). (Doc. 13 at 1). Defendant Toney also denies the material allegations asserted in Weaver's complaint. (Doc. 18). Defendant Toney avers that there was no violation of Weaver's constitutional right, that she cannot be held vicariously liable for Weaver's injuries, and that she is entitled to Eleventh Amendment immunity and qualified immunity. (Doc. 19). In an Order dated February 2, 2012, Defendants' Special Reports and Answers were converted into a motion for summary judgment, and the parties

---

he failed to allege facts sufficient to state a claim against Thomas. (Docs. 28, 31). Because Thomas is not a party to this action, the undersigned will not address Weaver's assertions regarding Thomas.

were provided an opportunity to file any responses in support or opposition. (Doc. 29).

In response to the Court's Order, Weaver filed a document entitled "Motion for Summary Judgment", wherein he asserts that "there [are] no genuine issue as to any material fact and the Weaver is entitled to a judgment as a matter of law." (Doc. 32). In support of his motion, Weaver filed a sworn affidavit, and a document entitled "Brief in Support of Plaintiff's Motion for Summary Judgment". (Doc. 33). After reviewing the pleadings, and supporting motions and materials, the Court has determined that all issues relating to the parties' Motions for Summary Judgment are now ripe and ready for resolution.

III. **SUMMARY JUDGMENT STANDARD**

In analyzing the propriety of a motion for summary judgment, the Court begins with these basic principles. The Federal Rules of Civil Procedure grants this Court authority under Rule 56 to render "judgment as a matter of law" to a party who moves for summary judgment. "[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact….'" Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)).

The Court must view the evidence produced by "the nonmoving party, and all factual inferences arising from it, in the light most favorable to" that party. Barfield v. Brierton, 883 F.2d 923, 934 (11th Cir. 1989). However, the Court is only to "make all reasonable inferences in favor of the party opposing summary judgment . . . not to make all possible inferences in the nonmoving party's favor." Torjagbo v. United States, 285 Fed. App'x. 615, 619 (11th Cir. 2008) (emphasis in original).

Rule 56(e)(2) states that:

> [w]hen a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must – by affidavits or as otherwise provided in this rule – set out specific facts showing a genuine issue for trial. If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party.

Fed. R. Civ. P. 56(e).

"[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. . . . If the evidence is merely colorable, . . . or is not significantly probative, . . . summary judgment may be granted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986) (internal citations omitted). "Summary judgment is mandated where a party 'fails to make a showing sufficient to establish the existence of an element

essential to that party's case, and on which that party will bear the burden of proof at trial.'" Custom Mfg. & Eng'g, Inc. v. Midway Servs., 508 F.3d 641, 647 (11th Cir. 2007) (citations omitted).

In a civil action filed by an inmate, although drawing "all justifiable inferences in [the inmate's] favor," federal courts

> must distinguish between evidence of disputed facts and disputed matters of professional judgment. In respect to the latter, our inferences must accord deference to the views of prison authorities. Unless a prisoner can point to sufficient evidence regarding such issues of judgment to allow him to prevail on the merits, he cannot prevail at the summary judgment stage.

Beard v. Banks, 548 U.S. 521, 529-30 (2006) (internal citation omitted). "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" Scott v. Harris, 550 U.S. 372, 380 (2007) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).

## IV.   ANALYSIS

### A.   Claims Against CMS

The Eighth Amendment provides that, "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII. "The Eighth Amendment's proscription of cruel and unusual punishments prohibits prison officials from exhibiting deliberate

8

indifference to prisoners' serious medical needs." Campbell v. Sikes, 169 F.3d 1353, 1363 (llth Cir. 1999) (citing Estelle v. Gamble, 429 U.S. 97, 104, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976). "Medical treatment violates the [E]ighth [A]mendment only when it is so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." Harris v. Thigpen, 941 F.2d 1495, 1505 (llth Cir. 1991).

In Sims v. Mashburn, 25 F.3d 980 (llth Cir. 1994), the Eleventh Circuit delineated the objective and subjective portions of an Eighth Amendment as follows:

> An Eighth Amendment claim is said to have two components, an objective component, which inquires whether the alleged wrongdoing was objectively harmful enough to establish a constitutional violation, and a subjective component, which inquires whether the officials acted with a sufficiently culpable state of mind.

Sims, 25 F.3d at 983 (citing Hudson v. McMillian, 503 U.S. 1, 8, 112 S. Ct. 995, 117 L. Ed. 2d 156 (1992)). To meet the objective element required to demonstrate a denial of medical care in violation of the Eighth Amendment, a plaintiff first must demonstrate the existence of an "objectively serious medical need." Farrow v. West, 320 F.3d 1235, 1243 (llth Cir. 2003). A serious medical need is "'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that

even a lay person would easily recognize the necessity for a doctor's attention.'" <u>Id</u>. (quoting <u>Hill v. Dekalb Reg'l Youth Det. Ctr.</u>, 40 F.3d 1176, 1187 (11th Cir. 1994), <u>overruled in part on other grounds by</u> Hope v. Pelzer, 536 U.S. 730, 739 n.9, 122 S. Ct. 2508, 153 L. Ed. 2d 666 (2002). "In either of these situations, the medical need must be one that, if left unattended, pos[es] a substantial risk of serious harm." <u>Id.</u> (internal quotation marks and citation omitted).

In order to meet the subjective requirement of an Eighth Amendment denial of medical care claim, Plaintiff must demonstrate "deliberate indifference" to a serious medical need. <u>Farrow</u>, 320 F.3d at 1234. "Deliberate indifference" entails more than mere negligence. <u>Estelle</u>, 429 U.S. at 106; <u>Farmer v. Brennan</u>, 511 U.S. 825, 835, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994).

> The Supreme Court clarified the "deliberate indifference" standard in <u>Farmer</u> by holding that a prison official cannot be found deliberately indifferent under the Eighth Amendment "unless the official *knows of* and *disregards an excessive risk to inmate health or safety*; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." <u>Farmer</u>, 511 U.S. at 837 (emphasis added). In interpreting <u>Farmer</u> and <u>Estelle</u>, this Court explained in <u>McElligott</u> that "deliberate indifference has three components: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere

negligence." <u>McElligott</u>, 182 F.3d at 1255; <u>Taylor</u>, 221 F.3d at 1258 (stating that defendant must have subjective awareness of an "objectively serious need" and that his response must constitute "an objectively insufficient response to that need").

<u>Farrow</u>, 320 F.3d at 1245-46 (emphasis in original).

"Delay in access to medical attention can violate the Eighth Amendment . . . when it is tantamount to unnecessary and wanton infliction of pain." <u>Hill</u>, 40 F.3d at 1187 (internal citations and quotation marks omitted). "Cases stating a constitutional claim for immediate or emergency medical attention have concerned medical needs that are obvious even to a layperson because they involve life-threatening conditions or situations where it is apparent that delay would detrimentally exacerbate the medical problem." <u>Id.</u>

The "seriousness" of an inmate's medical needs also may be decided by reference to the *effect* of delay in treatment. <u>Gaudreault</u>, 923 F.2d at 208; <u>Monmouth County</u>, 834 F.2d at 347. Where there the delay results in an inmate's suffering "a life-long handicap or permanent loss, the medical need is considered serious." <u>Id.</u> An inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed. Further, we have held that "[t]he tolerable length of delay in providing medical attention depends on the *nature* of the medical need and the *reason* for the delay." <u>Harris v. Coweta County</u>, 21 F.3d 388, 393-94 (llth Cir. 1994)(emphasis added). Consequently, delay in medical treatment

11

> must be interpreted in the context of the
> seriousness of the medical need, deciding
> whether the delay worsened the medical
> condition, and considering the reason for
> delay.

Hill, 40 F.3d at 1188-89 (emphasis in original) (footnotes
omitted).

As a preliminary matter, the undersigned finds that it is
not at all clear that Plaintiff has established the existence of
an objectively serious medical condition. The evidence reflects
that following the pilot light incident, Weaver complained of a
burning sensation to his face, and his eyes. Although he was
provided medical treatment immediately after the incident, and
on at least four separate occasions thereafter, none of the
medical care providers, including the optometrist and the
ophthalmologist who examined him, observed any abnormalities
with either of his eyes. When Weaver was examined by the nurse
practitioner a mere four days after the incident, on March 16,
2011, no abnormalities were observed, and his uncorrected vision
was noted as 20/50 in his right eye, and 20/40 in his left eye.
(Doc. 14-2 at 3). Later, when Weaver was examined by the
optometrist in August 2011, the results of the eye exam were the
same, and Weaver was provided a prescription for eye glasses.
(Id. at 14). Weaver was also examined by an ophthalmologist in
October 2011, the only treatment prescribed was artificial tears
to address Weaver's complaints of dry eyes. (Id. at 15). This

undisputed evidence demonstrates that whatever injuries Weaver suffered from the pilot light incident were relatively minor and did not rise to the level of a serious medical need. In the face of the undisputed medical evidence, Weaver has failed to point to any evidence that suggests that he had a serious medical need.

Even assuming arguendo that Weaver's eye condition constitutes a serious medical need, the record is devoid of any evidence that CMS was indifferent to Weaver's medical need. As noted supra, Weaver acknowledges that he was provided medical treatment without delay immediately following the incident. (Doc. 4 at 4). In addition, Weaver was evaluated twice by nurse practitioner Gaston, as well as by an optometrist and an ophthalmologist. While Weaver appears to argue that he should have been seen by an optometrist before August, his assertion is of no moment given that the results of the optometrist's examination in August 2011, were essentially the same as the nurse practitioner's examination shortly after the incident. None of the examinations revealed any abnormalities, and Weaver has pointed to no evidence which suggests that he did not receive proper treatment, nor has he submitted any "verifying medical evidence" showing that the delay in medical treatment resulted in any diminishment of his physical or mental health. Hill, 40 F.3d at 1188 (emphasis added). The fact that Weaver may

have desired a different course of treatment is not sufficient to raise an inference of deliberate indifference under the circumstances of this case. Accordingly, the undersigned finds that Weaver's allegations regarding CMS' alleged deliberate indifference falls short of what is required to state a claim for denial and or delay of medical treatment under the Eighth Amendment.

**B. Claims Against Debra Toney**

Weaver alleges that Defendant Debra Toney "caused [him] to be injured in an explosion." (Doc. 4 at 5). To support this contention, Weaver asserts that he was assigned to the maintenance detail although he had no experience, and that he had warned officials that the cooking appliances were "faulty and dangerous". (Id.). Weaver further asserts that during walk through inspections of the kitchens in 2010 and 2011, he informed Officers Johnson and Martin about problems with the oven and other appliances, and they made notations regarding the problems. (Doc. 33 at 3). Weaver contends that this was sufficient to place Defendant Toney on notice, and that she should be held accountable for his injuries.

It is well-settled that wardens are not liable under § 1983 for the unconstitutional acts of their subordinates merely because of their position or supervisory responsibilities. Cottone v. Jenne, 326 F.3d 1352, 1360 (11th Cir. 2003).

14

Supervisory liability may occur, however, either when the supervisor personally participates in the alleged unconstitutional conduct or when there is a causal connection between the actions of a supervising official and the alleged constitutional deprivation. (Id.). Isolated incidents are generally insufficient to establish a supervisor's liability; the deprivations must be "'obvious, flagrant, rampant and of continued duration . . . .'" Gray ex rel. Alexander v. Bostic, 458 F.3d 1295, 1308 (11th Cir. 2006) (quoting Hartley v. Parnell, 193 F.3d 1263, 1269 (11th Cir. 1999)). To impute a supervisor with knowledge, that knowledge "must be so pervasive that the refusal to prevent harm rises to the level of a custom or policy of depriving inmates of their constitutional rights." Tittle v. Jefferson Cnty. Com'n, 10 F.3d 1535, 1542 (11th Cir. 1994). A causal connection can also be established by facts which support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so. Post v. City of Ft. Lauderdale, 7 F.3d 1552, 1561 (11th Cir. 1993).

A prison official may be held liable for acting with "deliberate indifference" to an inmate's health or safety if he knows that the inmate faces a substantial risk of serious harm and disregards that risk by failing to take reasonable measures

to abate it. <u>Cottrell v. Caldwell</u>, 85 F.3d 1480, 1491 (11th Cir. 1996); <u>Farmer</u>, 511 U.S. at 847.

Accepting as true Weaver's assertions, they are not sufficient to create a genuine issue of disputed facts on this issue. Simply put, the record is devoid of any evidence that suggests that Defendant Toney knew or had reason to know that there was a faulty pilot light on the kitchen stove or that it would likely result in injury if not repaired. While Weaver has asserted that he pointed out problems with the stoves to an officer in 2010 and a different officer in 2011, and that Toney should thus have been aware of the problem with the pilot light on the stove, there is no evidence that Defendant Toney was ever placed on notice of any such problems[2]. In the absence of such evidence, there is no basis for finding that Defendant Toney should have been aware of problems with the pilot light on the stove, and thus should have appreciated the risk imposed by igniting the pilot light. Similarly, there is nothing to support

---

[2]   While Weaver asserts in his Complaint that Toney directed him to ignite the pilot light on the day in question, in his sworn affidavit, he attests that it was actually a kitchen steward who directed him to do so. (Docs. 4 at 4; 33 at 3). Indeed, in a sworn affidavit, Toney avers that she was not working on Saturday, March 12, 2011, the date of the incident; thus, she could not have instructed Toney to ignite the pilot light. (Doc. 19-2 at 1). Additionally, while Weaver asserts that "the Free-world maintain from G.K. Fountain CF....also reported the hazard problems to Toney", there is nothing in the record that reflects that Weaver or anyone else placed Toney on notice of the specific problems with the pilot light on the stove.

Weaver's contention that Defendant Toney should have been aware that he was not qualified for the maintenance position. First, Weaver acknowledges that at the time of the incident, he had been working in the maintenance assignment since August 2010, and was regularly called upon to work on the kitchen appliances. Thus, this was clearly not a situation where Weaver's injuries were sustained during his initial assignment to the maintenance crew. In any event, the record is totally devoid of any facts that suggest that Defendant Toney knew or had reason to know that such an assignment would expose Weaver to the risk of serious injury. This is particularly true given that Weaver successfully performed the maintenance tasks both before and after the incident. (Docs. 33 at 3; Doc. 19-2 at 1). The absence of facts demonstrating that Toney knew or had reason to know that the maintenance assignment would expose Weaver to the risk of serious injury compels a finding that Weaver has failed to make a showing sufficient to establish a constitutional violation. Accordingly, the undersigned finds that Defendant Toney is entitled to summary judgment in her favor on all claims asserted against her by Weaver.

**V.**   **CONCLUSION**

Based on the forgoing, it is recommended that the Defendants' Motion for Summary Judgment be GRANTED, that

Plaintiff's Motion for Summary Judgment be DENIED, and that Plaintiff's Complaint be DISMISSED with prejudice[3].

The instructions that follow the undersigned's signature contain important information regarding objections to the report and recommendation of the Magistrate Judge.

DONE this **1st** day of **August, 2012.**

**/s/ SONJA F. BIVINS**
**UNITED STATES MAGISTRATE JUDGE**

---

[3]  In light of the instant recommendation, it is likewise recommended that Weaver's Motion for Trial, Summary Judgment and Appointment of Counsel (Doc. 35), filed on July 27, 2012, be denied.

**MAGISTRATE JUDGE'S EXPLANATION OF PROCEDURAL RIGHTS
AND RESPONSIBILITIES FOLLOWING RECOMMENDATION
AND FINDINGS CONCERNING NEED FOR TRANSCRIPT**

1.  **Objection**.  Any party who objects to this recommendation or anything in it must, within fourteen days of the date of service of this document, file specific written objections with the clerk of court.  Failure to do so will bar a <u>de novo</u> determination by the district judge of anything in the recommendation and will bar an attack, on appeal, of the factual findings of the magistrate judge.  <u>See</u> 28 U.S.C. § 636(b)(1)(C); <u>Lewis v. Smith</u>, 855 F.2d 736, 738 (11th Cir. 1988).  The procedure for challenging the findings and recommendations of the magistrate judge is set out in more detail in SD ALA LR 72.4 (June 1, 1997), which provides, in part, that:

> A party may object to a recommendation entered by a magistrate judge in a dispositive matter, that is, a matter excepted by 28 U.S.C. § 636(b)(1)(A), by filing a "Statement of Objection to Magistrate Judge's Recommendation" within ten days[4] after being served with a copy of the recommendation, unless a different time is established by order.  The statement of objection shall specify those portions of the recommendation to which objection is made and the basis for the objection.  The objecting party shall submit to the district judge, at the time of filing the objection, a brief setting forth the party's arguments that the magistrate judge's recommendation should be reviewed <u>de novo</u> and a different disposition made.  It is insufficient to submit only a copy of the original brief submitted to the magistrate judge, although a copy of the original brief may be submitted or referred to and incorporated into the brief in support of the objection.  Failure to submit a brief in support of the objection may be deemed an abandonment of the objection.

---

[4]  Effective December 1, 2009, the time for filing written objections was extended to "14 days after being served with a copy of the recommended disposition[.]" Fed.R.Civ.P. 72(b)(2).

A magistrate judge's recommendation cannot be appealed to a Court of Appeals; only the district judge's order or judgment can be appealed.

2.   **Transcript (applicable where proceedings tape recorded)**. Pursuant to 28 U.S.C. § 1915 and Fed.R.Civ.P. 72(b), the magistrate judge finds that the tapes and original records in this action are adequate for purposes of review.   Any party planning to object to this recommendation, but unable to pay the fee for a transcript, is advised that a judicial determination that transcription is necessary is required before the United States will pay the cost of the transcript.

DONE this **1st** day of **August, 2012.**

**/s/ SONJA F. BIVINS**
**UNITED STATES MAGISTRATE JUDGE**